IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Allyson D. Martini-Roth, | ) | C/A No.: 1:12-1568-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Terry L. Wooten's order dated August 7, 2012, referring this matter for disposition.    [Entry #11].    The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner").    The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards.    For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.    Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

## I.    Relevant Background

### A.    Procedural History

On November 9, 2009, Plaintiff filed an application for disability insurance benefits ("DIB") in which she alleged her disability began on August 15, 2008.  Tr. at 112–15.  On November 17, 2009, she applied for Supplemental Security Income ("SSI") alleging the same disability onset date.  Tr. at 119–22.  Her DIB application was denied on the grounds that she did not have enough work credits to qualify for benefits.  Tr. at 53–58.  Her SSI application was also denied initially and upon reconsideration.  Tr. at 50–51.  In her request for a hearing, Plaintiff noted that she was applying for DIB and SSI.  Tr. at 74.  On December 14, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ.  Tr. at 25–47 (Hr'g Tr.).  The ALJ issued an unfavorable decision on January 9, 2012, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 9–18.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 11, 2012.  [Entry #1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 45 years old at the time of the hearing.  Tr. at 36.  She completed high school and some college.  Tr. at 37.  Her past relevant work ("PRW") was as a

caterer; book sales representative; and grocery clerk supervisor.  Tr. at 42.  She alleges she has been unable to work since August 15, 2008.  Tr. at 112, 119.

       2.     Medical History

          a.     Mental Impairments

              1)     Medical University of South Carolina Institute of Psychiatry

Plaintiff was treated at the Medical University of South Carolina ("MUSC") Institute of Psychiatry from January 1998 through September 2004 undergoing individual and group therapy.  Tr. at 238–302.  Notes in her medical records relate primarily to her struggles with alcoholism.  *See, e.g.*, Tr. at 238, 242, 243, 245, 252, 258, 262, 268, 269, 272, 273, 275, 284.  She was also treated for post-traumatic stress disorder ("PTSD"), Tr. at 259, 268; suicidal ideations and attempts, Tr. at 239, 240, 242, 264, 279; and depression, Tr. at 262, 287, 288.  She was treated for bipolar disorder, Tr. at 270, and reported manic episodes that included racing thoughts and nighttime hallucinations, Tr. at 266, 276, 279, 281, 288.  Plaintiff summarized her MUSC records in detail in her brief, and the court incorporates that summary by reference herein.

              2)     Charleston Mental Health Center

Plaintiff was also treated at the Charleston Mental Health Center ("CMHC") from March 2007 through August 2010.  On May 25, 2007, Plaintiff was noted to be committed to staying sober and attending Alcoholics Anonymous ("AA").  Tr. at 310.  She was also noted to be committed to taking her medications as prescribed and scheduling appointments as recommended.  *Id.*  She expressed a need to learn coping

skills to handle environmental stressors. *Id.* She was diagnosed with bipolar disorder, PTSD, and alcohol dependence. *Id.*

On September 11, 2008, during her treatment with CMHC, Plaintiff was seen at Charleston Pain and Rehabilitation. Tr. at 306. Many of the notes are illegible; however, it appears from those that are legible that she admitted to drinking "a lot" that day. *Id.* She exhibited slurred speech, was "speaking bizarrely," and falling asleep. *Id.*

In November of 2008, Plaintiff returned to CMHC where a physician noted she was recently hospitalized after being assaulted at Crisis Ministries by some men. Tr. at 551. The assault occurred on a Saturday night when she went to chair an AA meeting. It caused her to relapse and become suicidal and she was consequently hospitalized at Bon Secours St. Francis ("St. Francis") and detoxed. *Id.* She reported that since leaving the hospital, she had been having trouble sleeping. *Id.*

On February 1, 2010, Plaintiff returned to CMHC because she was court-ordered to involuntary commitment to receive inpatient treatment. Tr. at 547. She was ordered to receive treatment at CMHC until space opened up at Morris Village Rehabilitation Center ("MVRC"). *Id.* She was vague when questioned and stated that she was out of some of her medications and had totaled her car. *Id.* She reported taking herself off of Neurontin and was counseled on the importance of taking her medications as prescribed. *Id.* The therapist noted that Plaintiff could only vocalize insight and did not have it. *Id.* She was prescribed Prozac, Depakote, Neurontin, Trazodone, and Vistaril. Tr. at 548.

On April 27, 2010, Plaintiff began "the conversation by stating 'I have thoughts of suicide.'" Tr. at 545. She described her thoughts of suicide as occurring out of the blue

4

and that they possibly put her "at peace." *Id.* However, she expressed how much she loved her children and discussed that she found her own mother in a suicide attempt when she was a child. *Id.* She also discussed her thoughts that if she had not died yet as a result of her alcoholism, then there must be a plan for her. *Id.* Plaintiff was noted to be struggling with sobriety, but continued to receive treatment. Tr. at 546.

Plaintiff was seen on August 30, 2010, after a recent hospitalization. Tr. at 640. The treating clinician concluded Plaintiff had problems maintaining a primary support group, had inadequate social support, and had no structured income. Tr. at 639. Plaintiff was also noted to lack the support necessary to manage trauma as a triggering event, and it was further noted that her relapses with alcohol caused her not to take her medication as prescribed. Tr. at 639–40.

### 3)    Plaintiff's Hospitalizations

The record reflects that Plaintiff was hospitalized 12 times between March 1998 and January 2010. On March 23, 1998, she presented with suicidal ideation and was committed to MUSC for one week to provide stabilization and crisis management. Tr. at 289–90. It was noted that she had been hospitalized four times and had a history of bipolar disorder and alcohol dependence. Tr. at 289. She was also noted to have a history of seizures, black outs, and auditory and visual hallucinations due to alcohol, but she denied auditory or visual hallucinations when she did not use alcohol. *Id.* The treating physician observed that she appeared to live with inner rage and diagnosed her with borderline personality disorder consumed with anger and projection. Tr. at 290. She was prescribed Depakote, Zoloft, and Ativan. *Id.*

On July 20, 1998, Plaintiff voluntarily admitted herself to MUSC for alcohol dependence and abusing nonprescription Xanax.  Tr. at 291.  She reported drinking one gallon of vodka per day and stated that she had suffered from alcohol dependence since her late teens.  *Id.*  The treating physician strongly encouraged her to abstain from alcohol and attend AA meetings.  Tr. at 292.  She was discharged on July 22, 1998.  Tr. at 291.

The same day she was discharged from her voluntary commitment, she was readmitted involuntarily to MUSC.  Tr. at 293.  Although she had plans to go to a long-term substance abuse program in Florida, she returned home after her discharge and drank several glasses of vodka.  *Id.*  She then drove her car and was stopped by police because she was weaving on the Cooper River Bridge.  *Id.*  The police escorted her to the hospital where she was readmitted with a blood alcohol level of 0.14.  *Id.*  She was committed to the Center for Drug and Alcohol Programs and afforded group, individual, and milieu psychotherapy.  *Id.*  She was given Zyprexa, Depakote, and Antabuse and strongly encouraged to attend AA and abstain from alcohol use.  Tr. at 294.

On August 16, 1998, Plaintiff was again admitted to the Center for Drug and Alcohol Programs.  Tr. at 295.  This time, she was committed due to suicidal ideation and a plan to kill herself with a knife.  *Id.*  She still suffered from alcohol dependence and was reportedly drinking up to twenty vodka drinks daily.  *Id.*  She had delirium tremens and alcohol withdrawal seizures.  *Id.*  She was not experiencing hallucinations, but she had experienced blackouts and expressed feeling bad about her drinking.  *Id.*  She had not been complying with her medications of Depakote and Zyprexa for two weeks and she was tearful and angry, but denied any suicidal ideation. *Id.*  She was given Depakote,

6

Trazodone, and Motrin, and her Zyprexa was discontinued.  Tr. at 296.  She was very uncooperative with the hospital staff and exhibited numerous aggressive and passive aggressive features.  *Id.*  She was noted to have demonstrated all of the criteria for borderline personality disorder.  *Id.*  She was discharged on September 3, 1998.  Tr. at 295.

Plaintiff was committed to MUSC for suicidal ideation on February 7, 1999, after writing six suicidal notes and telling her sister about them.  Tr. at 298.  She still struggled with alcohol dependence and although she was recently discharged from the Roper Detox Unit, she was consuming a half gallon of vodka per day.  *Id.*  Her blood alcohol level was 0.315 on admission and her urine drug screen was positive for barbiturates.  *Id.*  She suffered from environmental and social stressors such as being estranged from her family, multiple arrests and DUIs, and not having custody of her children.  *Id.*  Her mental status exam showed she was uncooperative, hostile, and combative.  *Id.*  She was again committed to the Center for Drug and Alcohol Programs and given group, individual, and milieu psychotherapy.  Tr. at 299.  She was discharged on February 9, 1999.  Tr. at 298.

On January 14, 2004, Plaintiff was hospitalized for stabilization and suicidal ideation and seen by Stephen Mcleod-Bryant, M.D.  Tr. at 300.  She weighed 102 pounds and her mental status examination showed she exhibited dysphoric mood and passive suicidal ideation without a plan to act.  Tr. at 300–01.  She reported that she did not really wish to kill herself because she had "a lot to live for."  Tr. at 301.

Plaintiff was admitted to St. Francis on November 7, 2008, because she was suicidal.  Tr. at 347.  Dr. Rosen attended to her and his notes show he questioned her history of bipolar disorder.  *Id.*  He opined that she had little history of long-term sobriety so it was difficult to diagnose anything other than substance-induced mood disorder.  *Id.*  He noted that she had been taking Depakote for years, but that it was primarily for her seizures and she had several withdrawal seizures in the past.  *Id.*  She was detoxed with Valium, her mood improved after two or three days, and she denied any suicidal ideation throughout her stay.  Tr. at 347–48.  Dr. Rosen diagnosed her with substance abuse mood disorder, alcohol abuse and dependence, seizure disorder, and anxiety disorder not specified.  Tr. at 348.  He prescribed Prozac for her anxiety and instructed her to continue to take Depakote.  *Id.*

On February 13, 2009, police took Plaintiff to the emergency room at St. Francis after she had been drinking heavily.  Tr. at 336.  Her chart described her as "well known to [the] department" as a chronic alcoholic.  *Id.*  She was kept in the emergency room ("ER") until her blood alcohol level decreased and she was aware of her surroundings and not suicidal.  Tr. at 337.  She did not meet the criteria for involuntary commitment and was released into the custody of the county sheriff.  *Id.*  Her primary diagnosis was alcohol dependence.  *Id.*

On June 21, 2009, Plaintiff was taken to the emergency room at St. Francis hospital after having a seizure in a bar.  Tr. at 320–21.  Bystanders reported she fell from her seat at the bar and experienced a seizure for roughly four minutes.  Tr. at 321.  When she awoke she felt "slightly off" and it was noted that she had a history of seizures since

childhood. *Id.* She informed the doctor that she had been taking several different medications, but that she was not taking any medication for her seizures at that time. *Id.* She admitted that she was drinking that day, but stated that alcohol use usually did not precede her seizures. *Id.*

On January 20, 2010, Plaintiff was court ordered for involuntarily commitment to the South Carolina Department of Mental Health for 30 days of inpatient treatment at the MVRC. Tr. at 123. She was ordered for involuntary commitment because, due to her mental condition, she "lack[ed] sufficient insight or capacity to make responsible decision[s] with respect to her treatment" and "there [was] a likelihood of serious harm to herself or others." Tr. at 126.

Police took Plaintiff to MUSC on July 24, 2010, again due to suicidal ideation and planning and alcohol intoxication. Tr. at 635. She stated that she drank a half gallon of vodka the night before, which was a reaction to her husband's recent incarceration. Tr. at 593. She also expressed a desire to commit suicide by jumping off a balcony. *Id.* When she was taken to the ER, she was highly agitated, so she was placed in seclusion. *Id.* She was discharged on July 27, 2010. Tr. at 635.

From December 2 through December 13, 2010, Plaintiff was involuntarily hospitalized at Palmetto Lowcountry Behavioral Health ("PLBH") due to an alcohol binge and a Xanax overdose. Tr. at 661. Lydia W. Haren, M.D., noted that Plaintiff had a long history and pattern of suicide attempts while under the influence of alcohol. *Id.* Dr. Haren also reported that Plaintiff had been in inpatient treatment on at least fourteen different occasions at the Institute of Psychiatry and had been at PLBH at least two times.

9

Tr. at 667.  On this instance, she presented to the ER with a blood alcohol level of .30.

Tr. at 661.  She was intubated in the intensive care unit before being transferred to PLBH,

where, upon presentation, she appeared confused and sedated and she had difficulties

concentrating.  *Id.*  She reported experiencing multiple psychosocial stressors, including

her husband being in jail.  Tr. at 667.  She denied alcohol use on a daily basis, but

explained she had an issue with binge drinking.  *Id.*  On each of those occasions, she

drank a couple of pints of vodka.  *Id.*  She reported that her longest stint of sobriety was

five months roughly fifteen years prior.  *Id.*  Dr. Haren found that while Plaitniff's

intelligence was probably average, her insight and judgment were severely impaired.  Tr.

at 668.  Although she cooperated, she demonstrated a limited social network and limited

coping skills.  *Id.*  Dr. Haren diagnosed her with alcohol dependence and borderline

personality disorder.  Tr. at 662.

4)    Mental Status Evaluations

On April 19, 2010, Plaintiff underwent a mental status examination conducted by

state-agency consultant John Custer, M.D.  Tr. at 568.  Dr. Custer noted that Plaintiff was

discharged from MVRC after being committed for 30 days based on a court order.  *Id.*

Before that she was hospitalized at MUSC and after she was released, she was arrested

for a DUI.  Tr. at 568.  Dr. Custer noted that Plaintiff had a history of unstable behavior,

made poor decisions, and used bad judgment.  He further noted that her social history

was rocky, especially since she lost her job with Goodwill in 2008.  Tr. at 570.  Since she

lost her job, she had been doing a lot of binge drinking and neglecting her medications, so

she admitted that she was a "mess."  *Id.*  Although Plaintiff denied drug abuse, there was

a suggestion in her medical records that she may have abused benzodiazepines in the past. *Id.* Dr. Custer opined that she had a tendency to become vague when he asked her direct questions about her alcohol abuse and history. *Id.* In his prognosis, he stated she appeared to primarily suffer from alcohol dependence, which resulted from a period of instability for the past fifteen months. Tr. at 571. He speculated that she could improve if she abstained from alcohol. *Id.* He diagnosed her with alcohol dependence in early remission, bipolar disorder history, and borderline personality disorder/and or histrionic personality traits. *Id.* He recommended that she obtain a representative payee due to her history of substance abuse and poor money management. *Id.*

On May 13, 2010, state-agency consultant Olin Hamrick Jr., PhD, completed a Psychiatric Review Technique ("PRT") regarding Plaintiff. Tr. at 553. He opined that Plaintiff had non-severe affective (bipolar) and substance abuse disorders. *Id.* He further opined that she was mildly restricted in activities of daily living; had mild difficulties in maintaining social functioning, concentration, persistence, and pace; and had no episodes of decompensation. Tr. at 563.

b.     Physical Impairments

On July 22, 2009, Plaintiff visited Southern Orthopedics and Sports Medicine ("SOSM") with left shoulder pain following a bicycle accident. Tr. at 414. She reported that the pain occurred occasionally, was worsening, and was aggravated by movement and overhead reaching. *Id.* As a result of the pain, she stated that she suffered from decreased mobility, difficulty sleeping, night pain, nighttime awakening, numbness, swelling, tingling in her arms, tenderness, and weakness. *Id.*

11

She returned to SOSM on August 12, 2009, continuing to complain of left shoulder pain. Tr. at 411. Dr. Brodie E. Mckoy referred her to Charleston Imaging for an MRI. Tr. at 388. At Charleston Imaging, Dr. Goltra opined that her shoulder had mild widening of the left acromioclavicular joint. Tr. at 389. There was some fluid signal intensity within the joint space and mild distention of the joint capsule. In addition, there was mild supraspinatus tendinopathy. *Id.*

On August 31, 2009, Plaintiff reported that her pain severity level was a six and her problem was not changing. Tr. at 409. Her symptoms were stiffness, swelling, and weakness. *Id.* Plaintiff followed up with Dr. Mckoy on September 28, 2009, and stated that her pain level was a nine. Tr. at 407. She reported that her pain occurred occasionally and showed mild worsening. *Id.* She described the pain as aching and sharp and aggravated by lifting and movement. *Id.* However, she stated that it was relieved by prescription medication. *Id.*

Plaintiff followed up with SOSM again on October 14, 2009. Tr. at 404. She stated that her shoulder pain severity level was a six and it showed mild worsening. *Id.* Dr. Mckoy discussed her options for treatment with her and they elected to proceed with surgery. Tr. at 405.

C.    The Administrative Proceedings

        1.    The Administrative Hearing

                a.    Plaintiff's Testimony

At the hearing on December 14, 2011, Plaintiff testified that she was diagnosed with bipolar disorder in 1997 and had been disabled since 2008. Tr. at 29. She stated

that in 2008 she worked as a disabled client for Goodwill Industries for eight months, but was terminated as a result of a bipolar episode. *Id.* During the episode, she had a box cutter in her hand that could have caused harm. *Id.* She testified that since the episode, she has not been mentally stable enough to seek employment. *Id.*

Plaintiff testified that she has suffered from bipolar disorder for the majority of her life, but she was unaware that this affliction was the root of her problems until her diagnosis in 1997. *Id.* As a result of her illness, she has been grandiose, manic, and depressed and has taken several prescription medications. Tr. at 29–30. She stated that she also had problems with substance abuse and had been institutionalized excessively during the prior 15 years. Tr. at 30. She testified that she was hospitalized approximately three times since 2008, twice following suicide attempts. *Id.* Plaintiff stated that she had been sober since November 29, 2010, except for an incident three months prior to the hearing. Tr. at 31. She stated that she continued to receive mental health treatment every Tuesday, and although the treatment had been helpful, she continued to experience good days and bad days. Tr. at 31, 37.

Plaintiff explained that she was extremely forgetful and was unable to focus for more than 15 to 20 minutes at a time. Tr. at 32. She stated that she also suffered from fearfulness, anxiety, and PTSD. *Id.* She said she suffered from PTSD after being attacked outside of Crisis Ministries while attending an AA meeting. *Id.* As a result of the attack, she stated that she had bad nightmares, was afraid to be alone with a male, and could not be alone at night without a light on. Tr. at 32–33.

Plaintiff stated that she lived with a friend and his elderly mother. Tr. at 33. She said she was able to help her friend's mother, groom herself, cook, and do some light housework and gardening. Tr. at 33, 38. She testified that to pass the time, she read "a lot," studied the Bible, and watched church programs on television on Saturdays and Sundays. Tr. at 33, 39. She stated she also visited with her family who would pick her up and drop her off. Tr. at 39. She stated that she was unable to go to the grocery store alone because she was afraid. Tr. at 32. She said she was unable to drive because her driver's license was suspended, but that she was eligible for Tel-A-Ride because her bipolar disorder was listed as severe. Tr. at 33, 40. She testified that although her lack of activity reduced some stress for her, it did not alleviate all stressful situations in her life, including her lack of custody of her children due to her mental illness. Tr. at 33–34.

Plaintiff stated that her medications caused side effects including severe dizziness and fatigue. Tr. at 34–35. She testified that she often changed medications and doses because the type and dose of medications for bipolar disorder involves trial and error. Tr. at 35.

Plaintiff stated that she had looked for low-stress work, but she was unable to obtain any, partly due to her record of driving under the influence. Tr. at 39. She said that her mental issues were her major concern and that she had trouble focusing on tasks. Tr. at 40.

### b.    Vocational Expert Testimony

A Vocational Expert ("VE") reviewed the record and testified at the hearing. Tr. at 41. The VE categorized Plaintiff's PRW as a caterer as skilled, light work; as a book

sales representative as skilled, light work; and as a grocery clerk supervisor as skilled, light work.  Tr. at 42.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at all exertional levels, but could not be exposed to unprotected heights and was limited to simple, routine, repetitive tasks; only occasional changes in the work setting; and only occasional interaction with the public. *Id.*  The VE testified that the hypothetical individual would not be able to perform Plaintiff's PRW.  *Id.*  The ALJ asked whether there were any other jobs that the hypothetical person could perform.  *Id.*  The VE identified the jobs of counter clerk, survey worker, and stock and inventory clerk, but noted that the first two jobs would require periodic interaction with the public for short periods of time.  Tr. at 42–43.  The ALJ then asked the VE to consider the same hypothetical individual, but further limited the hypothetical to no production or pace work and no interaction with the public.  Tr. at 43.  The VE stated that the hypothetical individual could still perform the work of a stock and inventory clerk and could also work as a quality control examiner and a product tester and weigher.  Tr. at 43–44.  The VE stated that there would be no jobs available if the hypothetical individual were off-task for more than an hour and a half or missed more than two days of work per month.  Tr. at 44–45.

### 2.    The ALJ's Findings

In his decision of January 9, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since November 9, 2009, the application date (416.971 *et seq.*).
2.    The claimant has the following severe impairments: affective mood disorder and alcohol/substance abuse (416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant should avoid exposure to unprotected heights.  She is also limited to simple, routine, repetitive tasks with only occasional changes in work setting and no production or pace work.  She is restricted to occasional interaction with the public.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on October 2, 1966 and was 43 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 9, 2009, the date the application was filed (20 CFR 416.920(g)).

Tr. at 11–18.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ erred by failing to consider Plaintiff's Title II claim;

2)  the ALJ conducted an improper listing analysis;

3)  the ALJ improperly evaluated Plaintiff's alcohol use in relation to her bipolar disorder; and

4)  the ALJ conducted a flawed credibility analysis.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls*

---

match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.      Analysis

        1.      Plaintiff's DIB Claim

Plaintiff filed an application for DIB on November 9, 2009, in which she alleged her disability began on August 15, 2008. Tr. at 112–15. Her DIB application was denied on the grounds that she did not have enough work credits to qualify for benefits. Tr. at 53–58. Plaintiff argues that the Commissioner did not address her DIB claim on reconsideration and that the ALJ erroneously failed to make a final determination on her DIB claim despite her specific request that the ALJ re-evaluate the question of her date last insured ("DLI"). [Entry #19 at 24]. She further argues that she may have qualified for DIB coverage because she met the 20/40 requirement set forth in 20 C.F.R. § 404.130, the Commissioner is permitted to rearrange quarters of coverage to the benefit of a claimant, and a claimant may establish a "disability freeze" period that impacts her right to disability benefits. *Id.* at 25.

The Commissioner responded to Plaintiff's argument in a footnote stating:

> Plaintiff also filed for disability insurance benefits (DIB) under Title II in November 2009 (Tr. 112, 116). However, the agency properly determined that she did not meet the requirement of the necessary amount of work credits for eligibility for DIB (Tr. 53, 56). The Commissioner would respectfully point out that in her request for review of the hearing decision, Plaintiff's counsel only references their representation of Plaintiff in her claim for Title XVI benefits (Tr. 4–5).

[Entry #21 at 1, n.2].

The Commissioner's response contains no argument, rather it rests entirely on the conclusory assertion that "the agency properly determined" Plaintiff's eligibility for DIB. Although the Commissioner contends that Plaintiff's request for review of the hearing decision references only her SSI claim, her request for a hearing noted that she was applying for both DIB and SSI.    Tr. at 74.    In addition, the record contains correspondence from Plaintiff's counsel to the ALJ that makes clear that Plaintiff was seeking review of her DIB claim.  Tr. at 233–36.  In light of the Commissioner's failure to adequately respond to Plaintiff's argument, the undersigned is unable to determine whether the Commissioner's decision regarding Plaintiff's DLI is supported by substantial evidence and, thus, is constrained to remand this matter to the ALJ.   On remand, the ALJ is directed to consider and address whether Plaintiff is eligible for DIB coverage.

### 2.    Plaintiff's Remaining Allegations of Error

Plaintiff also argues that the ALJ failed to properly consider whether Plaintiff meets Listing 12.04(B) and (C), improperly evaluated Plaintiff's alcohol use in relation to her bipolar disorder, and conducted a flawed credibility analysis.  [Entry #19 at 26–33]. In light of the decision to remand based on the ALJ's failure to address Plaintiff's DIB claim, the court does not address Plaintiff's remaining allegations of error in detail.  The court notes, however, that the Commissioner's briefing on these issues is deficient.  The Commissioner's response to Plaintiff's Listing argument contains conclusory assertions with no articulated support.   [Entry #21 at 5–6].   The Commissioner's response to Plaintiff's credibility argument likewise contains no support specific to this case.  *Id.* at

7–8.  The Commissioner's responses on these issues are so general and conclusory that they could be included in any other case asserting these allegations of error.  As to Plaintiff's argument that the ALJ erred in evaluating her alcohol use, the Commissioner provided no response at all.    On remand, the ALJ is directed to consider Plaintiff's remaining allegations of error and comply with the applicable laws and regulations in evaluating them.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g).

IT IS SO ORDERED.

August 23, 2013                                          Shiva V. Hodges
Columbia, South Carolina                          United States Magistrate Judge